STATE of Minnesota, Petitioner,
Appellant,

v.

William GLOWACKI, Respondent.

No. C8–99–1507.

Supreme Court of Minnesota.

July 12, 2001.

Rehearing Denied Aug. 8, 2001.

Mike Hatch, Atty. Gen., Peter A. Mac-Millan, Pondoni, MacMillan & Schneider, Ltd., Minneapolis, for appellant.

Deborah Ellis, St. Paul, for respondent.

Howard Bass, Daniel Guerrero, Meshbesher & Spence, Ltd., Minneapolis, for amicus curiae MN Ass'n of Criminal Defense Lawyers.

Amy Klobuchar, Hennepin County Atty., Michael Richardson, Asst. County Atty., Minneapolis, for amicus curiae MN County Attorneys Association.

## OPINION

PAUL H. ANDERSON, Justice.

Respondent William Glowacki was charged with assault, disorderly conduct, and domestic assault for allegedly attacking a woman in his home. At trial Glowacki asserted that he was acting in self-defense and requested that the district court instruct the jury on self-defense. The court, relying on a Minnesota Court of Appeals case that had been reversed, included a duty to retreat instruction along with a self-defense instruction. Glowacki was found guilty on all charges. The court of appeals reversed the jury's guilty verdicts on assault and domestic assault, concluding that the district court had erroneously instructed the jury that Glowacki had a duty to retreat. The state appealed. We reverse the court of appeals, reinstate the jury's verdicts, and remand to the court of appeals for consideration of Glowacki's other issues on appeal.

Respondent William Glowacki and Priscilla Andrews met at a bar in Dolthan, Alabama late in the summer of 1998. After Glowacki returned to his Corcoran, Minnesota home, he and Andrews maintained telephone contact over the next few months. In late December 1998 or early January 1999, Glowacki returned to Dolthan and he and Andrews spent part of a day together. Following this visit, Glowacki and Andrews had more frequent telephone contact. Glowacki visited Andrews in Dolthan in late January and at this time they became intimately involved. Beginning in February, Glowacki and Andrews met approximately every two weeks in either Dolthan or Minnesota. Glowacki paid for Andrews' airplane tickets to Minnesota, and in March of 1999, he paid for tickets for Andrews' two adult daughters to accompany her. During this March visit, Andrews and her daughters brought many of Andrews' clothes with them, which they left at Glowacki's home. Glowacki provided closet and dresser space for Andrews to store her clothes. In late March, Glowacki spent a week in Dolthan making repairs to Andrews' house.

Andrews testified that Glowacki made the repairs on her house and she brought her clothes to Corcoran in anticipation of her moving in with Glowacki. Glowacki testified that he never intended Andrews to move into his home. He also testified that his sexual relationship with Andrews ended during his weeklong visit to Dolthan in March, although he admits that the two continued to sleep in the same bed when they were together.

Andrews flew to Minnesota on April 1, 1999 and stayed with Glowacki. Andrews had a return ticket to Dolthan on April 21. Andrews had quit her job in Dolthan, but did have another job in place there. Andrews testified that she was returning to Dolthan on April 21 only to get her children settled. Andrews further testified that she and Glowacki had set a July wedding date.

On April 2, 1999, Glowacki and Andrews had an argument, during which Glowacki

struck Andrews. Andrews testified that Glowacki became angry and struck her in the face, knocking her unconscious and giving her a black eye. Glowacki testified that he did strike Andrews, but not in the manner she suggested; rather, that he struck her only after she became hysterical and threatening. Glowacki also produced witnesses who testified that Andrews did not have a black eye following the incident. Andrews testified that she put theater makeup on her eye to cover the bruising. Andrews stated that after the incident on April 2 she considered her relationship with Glowacki over and began making plans to return to Dolthan as soon as possible.

Six days later, on April 8, Andrews accompanied Glowacki to a city council meeting. At the time, Glowacki was a member of the Corcoran City Council. After the meeting, the pair returned to Glowacki's home and the incident leading to the criminal charges in this case occurred. Andrews and Glowacki gave differing versions of what happened after they returned home.

*April 8 incident—Andrews' version*

Upon returning home, Glowacki and Andrews sat down in the kitchen and began drinking wine. Andrews estimated that she drank approximately one-third of a bottle of Sangria and that Glowacki drank an entire bottle of Merlot. Andrews believed that Glowacki was upset about the city council meeting. She set her wineglass down and Glowacki yelled at her that she had almost spilled on an expensive chair. Glowacki and Andrews then moved to the bedroom and Glowacki laid down on the bed. Andrews asked Glowacki if he was going to bed and Glowacki responded with a profane statement and made a reference to another woman whom he had dated. After hearing this, Andrews left

the bedroom and went to the den in the basement.

Soon after Andrews reached the den, Glowacki followed. Glowacki again made a profane statement and hit Andrews on the side of her head, knocking her down. Glowacki then kicked Andrews severely between 50 and 100 times, telling her he was going to kill her. During the kicking, Andrews was screaming and attempted to get up and she testified that "[e]very time I would try to stand up he would kick me back down * * *." At one point Andrews managed to stand up and Glowacki put his hands around her throat. Glowacki also ripped the button off of her robe and told her to "[g]et the hell out of my goddamn house." Andrews denied hitting or threatening Glowacki during the incident. Andrews estimated that the abuse lasted for about 20 minutes before she managed to run upstairs, grab a phone, and lock herself in the bathroom. Andrews then called the operator, who transferred her call to a 911 dispatcher.

*April 8 incident—Glowacki's version*

When he and Andrews returned home from the city council meeting, Glowacki changed his clothes, poured himself a glass of wine, and sat down at the kitchen table to review some papers from the meeting. Andrews then sat down at the table and the two began talking about the council meeting.

Glowacki suggested that he and Andrews move to the den in the basement to watch a movie. Glowacki and Andrews sat in large stuffed leather recliners next to each other. Andrews was talking about something, but Glowacki was not paying attention. Glowacki saw Andrews nearly spill her wine on her recliner and asked her to be careful. Andrews asked Glowacki what his problem was, but he did not reply. Andrews then jumped out of her chair and stood directly in front of

Glowacki, only inches away from him, and bent over him. Glowacki testified that she began screaming "a lot of horrible things." Andrews rested her left hand on the arm of the chair, but kept her right arm behind her back, causing Glowacki to fear that she had something in her right hand. At one point during the screaming, Andrews hit Glowacki on the shoulder with her left hand.

Eventually Glowacki kicked Andrews with his right leg and she fell to the floor. Glowacki then stood up from the chair and told Andrews that she needed to "knock it off" and that in the morning she needed to pack her bags and leave. Glowacki began to walk toward the stairs when he sensed Andrews behind him. He began to turn and saw something moving toward his head, so he threw his arm out as he turned and pushed Andrews to the floor. Glowacki then backed up and stood next to the recliner. Andrews stood up, screaming and yelling at Glowacki, walked over to the couch, sat down and began to cry. Glowacki waited until she had settled down a bit and while speaking quietly, began to approach Andrews. When he got close to the couch, Andrews kicked him in the left thigh. Glowacki testified that he got angry and told Andrews that they were going to pack her things and he was taking her to a hotel right then. In response, Andrews screamed an expletive at Glowacki and yelled that she was going to destroy him. Andrews then got up from the couch and went upstairs.

Glowacki sat down in the basement for about five minutes and then went upstairs to the kitchen to look for phone books so he could arrange a hotel room and a flight for Andrews. He was sitting in the kitchen when the police arrived.

*Subsequent Events and Court Proceedings*

Officers from the Hennepin County Sheriff's Department and the Corcoran

Police Department responded to Andrews' call. After arriving on the scene, some of the officers questioned Andrews and photographed her injuries and others questioned Glowacki. When the officers informed Glowacki that they would have to arrest him, he stated that he did not want to leave Andrews in his home. Glowacki then gave the officers $200 to pay for a hotel for Andrews and called the airlines and changed Andrews' ticket so she could return to Dolthan the next day. The officers assisted Andrews in packing her clothing and took her to a hotel near the airport. Glowacki was arrested and taken to the Hennepin County Adult Detention Center.

Glowacki was subsequently charged with fifth-degree assault, domestic assault, and disorderly conduct in violation of Minn. Stat. §§ 609.224, subd. 1 (2000), 609.2242, subd. 1 (2000), and 609.72, subd. 1(3) (2000). Glowacki requested a jury trial, which was held August 13–18, 1999. At trial, Andrews testified for the state, along with the officers who responded to the 911 call. The state introduced into evidence the photographs of Andrews taken at Glowacki's home on April 8, photographs of Andrews taken by her daughter on April 13, cards that Glowacki had sent to Andrews in February and March of 1999, the 911 intake form, and a tape of Andrews' 911 call. Glowacki testified in his own defense and presented witnesses to discredit Andrews' testimony and to show that she had attempted to alter the April 13 photos so her bruises would look darker.

Glowacki requested that the court give a jury instruction on self-defense, 10 Minn. Dist. Judges Ass'n, *Minnesota Practice— Jury Instruction Guides, Criminal,* CRIMJIG 7.06 (4th ed.1999). The state acknowledged that there was some evidence to support giving a self-defense in-

struction, but requested that CRIMJIG 7.08, the duty to retreat instruction, accompany it. The parties presented arguments to the court as to whether the duty to retreat instruction was applicable. Glowacki asserted that Andrews was an unwelcome guest in his home at the time of the attack. The state argued that there is always a duty to retreat when acting in self-defense in one's home, based on the court of appeals' opinion in *State v. Carothers*, 585 N.W.2d 64 (Minn.App.1998), *rev'd*, 594 N.W.2d 897 (Minn.1999). The district court expressed a belief that there was a more recent supreme court or court of appeals decision on the subject, but the state asserted that *Carothers* was still good law as of the beginning of July 1999. Glowacki's counsel also was not aware of any new law on the subject. However, two months earlier, on June 17, 1999, we reversed the court of appeals' decision in *Carothers*. *State v. Carothers*, 594 N.W.2d 897, 898 (Minn.1999).

Relying on the court of appeals' version of *Carothers*, the district court stated to counsel that there was a duty to retreat in self-defense, regardless of whether the aggressor is an intruder or a resident of the home where the incident takes place. However, the court proposed a modification to CRIMJIG 7.08 by removing the words "retreat or." [1] Both parties agreed to this modification. After the jury was charged, the court gave the parties an opportunity to state any objections to the instructions as given. Glowacki did not object to the duty to retreat instruction.

The jury found Glowacki guilty on all counts. At the sentencing hearing, Glowacki made a motion for a new trial based on the fact that the court of appeals' version of *Carothers* was not good law at the time of his trial. In denying the motion for a new trial, the court classified Andrews as "an invited guest" of Glowacki. The court also stated that from its reading of the syllabus of *Carothers*, the case did not apply because it dealt with defense of dwelling, not self-defense. Glowacki was then convicted of fifth-degree assault and sentenced to 90 days in the Hennepin County Adult Correction Facility, 45 of which were stayed for a year. The court also imposed a $700 fine, plus surcharges and the $125 domestic assessment fee, and denied a stay pending appeal and work release. Glowacki filed an expedited appeal with the court of appeals on the denial of a stay pending appeal and work release. The court of appeals remanded Glowacki's motion for reconsideration. The district court again denied a stay pending appeal and work release and outlined reasons for its decision as requested by the court of appeals.

Glowacki then appealed his conviction and sentence to the court of appeals, asserting four arguments: (1) the jury's guilty verdicts for assault and domestic assault should be overturned because the district court erred in instructing the jury that he had a duty to avoid danger in his own home while acting in self-defense; (2) the jury's guilty verdict for domestic assault should not stand because Andrews did not fit the statutory definition of "family or household member"; (3) Glowacki was improperly restricted in his cross-examination of Andrews; and (4) the district court abused its discretion when it denied Glowacki work release privileges. Glowacki noted in his brief to the court of appeals that he finished serving the exe-

---

**1.** The modified version of CRIMJIG 7.08, as given to the jury, read, "The legal excuse of self-defense is available only to those who act honestly and in good faith and this includes the duty to [retreat or] avoid the danger if reasonably possible." (Omitted words in brackets.)

cuted part of his sentence while his appeal was pending before the court of appeals.

The court of appeals reversed Glowacki's assault and domestic assault convictions. *State v. Glowacki*, 615 N.W.2d 843 (Minn.App.2000). The court concluded that Glowacki and Andrews were co-residents because they were still sharing a residence even if they had decided to terminate their relationship. *Id.* at 845. The court went on to state that our opinion in *Carothers* held that there was no duty to retreat when acting in self-defense in one's home against a co-resident aggressor. *Glowacki*, 615 N.W.2d at 844–45. It then concluded that the district court's error in instructing the jury was "significant" and therefore Glowacki was entitled to a new trial. *Id.* At the end of its opinion, the court stated that despite Glowacki's failure to object to the instruction, the court could reverse because the instructions were "misleading or confusing on fundamental points of law." *Id.* The court did not address Glowacki's other arguments.

On appeal to this court, the state and amicus curiae Minnesota County Attorneys Association (MCAA) urge us to conclude that the district court correctly instructed the jury that Glowacki had a duty to retreat. The state also argues that if it was error to give the duty to retreat instruction, the error was harmless and that Glowacki waived any challenge to the instruction by failing to object to it. Glowacki and amicus curiae Minnesota Association of Criminal Defense Lawyers (MACDL) urge us to conclude that there is no duty to retreat from the home when acting in self-defense against a co-resident.

## I.

■ Glowacki did not object to the jury instructions as given at trial, but he asserts on appeal that his failure to object was due to the fact that the district court and the parties were operating under a misconception of the status of the law and therefore under Minn. R.Crim. P. 26.03, subd. 18(3), his motion for a new trial preserved the objection.[2] Generally, a party waives the right to appeal a jury instruction by failing to object to it at trial. *State v. Crowsbreast*, —— Minn. ——, 629 N.W.2d 433 (Minn.2001). However, the situation here is different from that in which we apply the plain error analysis in that Glowacki objected to the error in a motion for a new trial, as opposed to first raising the issue on appeal. *Id.* In such situations, despite a defendant's failure to object to a jury instruction at trial, "if the instruction contains an error of fundamental law or a controlling principle, a motion for a new trial adequately preserves the issue for appeal." *State v. McKenzie*, 532 N.W.2d 210, 222 n. 12 (Minn.1995); Minn. R.Crim. P. 26.03, subd. 18(3). To conform to the requirements of Rule 26.03, subd. 18(3), the error that Glowacki asserts must be one of fundamental law or controlling principle.

Here, the district court based its jury instructions on a case we reversed. More importantly, when developing the instructions, the district court asserted that whether Andrews was a co-resident with Glowacki was irrelevant because in either case Glowacki would have a duty to retreat. This assertion was wrong. We held in *Carothers* that there is no duty to retreat from the home when acting in self-defense against an intruder. *Carothers*, 594 N.W.2d at 903. Because the jury instructions given were in error and that

---

**2.** The last sentence in Minn. R.Crim. P. 26.03, subd. 18(3), states: "An error in the instructions with respect to fundamental law or controlling principle may be assigned in a motion for a new trial though it was not otherwise called to the attention of the court."

error was one of fundamental law or controlling principle, we hold that Glowacki's motion for a new trial adequately preserved the jury instruction issue for appeal.

## II.

 Generally, the law mandates a duty to retreat if reasonably possible when acting in self-defense. *Carothers*, 594 N.W.2d at 899. However, in *Carothers* we held that when there is an intruder in one's home, there is no duty to retreat when acting either in defense of dwelling or in self-defense. *Id.* at 903. We said: "Having concluded that the imposition of a duty to retreat would be improper in defense of dwelling situations, we see no sound reason to impose a duty to retreat when those same circumstances are characterized as self-defense within the home." *Id.* In reaching this conclusion, we analyzed the differences between defense of dwelling and self-defense and noted the clear policy in the law to value life above property. *Id.* However, we did reserve the issue of whether there are situations when one would be required to retreat even though acting in self-defense in his home. *Id.* at 903–04. In stating this reservation, we referenced a situation in which the aggressor and the one claiming self-defense are co-residents. *Id.* at 904 n. 6.

Although we have not analyzed this question before, we upheld a district court's instruction on the duty to retreat when the defendant claimed self-defense against a co-resident. *State v. Hennum,* 441 N.W.2d 793, 800 (Minn.1989). In *Hennum* we affirmed without comment the duty to retreat instruction in the trial of a woman convicted of killing her husband in their home when she claimed self-defense. *Id.* at 800 n. 5. In *State v. Morrison,* 351 N.W.2d 359 (Minn.1984), we also affirmed without comment the duty to retreat in-

struction which was given at the trial of a woman accused of killing her boyfriend's roommate, who had been an invited guest in her home earlier in the evening. 351 N.W.2d 359, 362 (Minn.1984). In *Morrison,* the defendant claimed to be acting in self-defense when her boyfriend's roommate returned to her home. *Id.* These two cases appear to give an indication of our position on this issue; however, neither case provides any explanation or rationale for the decision. In *Carothers* we noted our "summary affirmance [in *Hennum* and *Morrison* ] of the duty to retreat in a self-defense case between co-occupants," but by reserving the issue, we suggested that the question may be open. *Carothers,* 594 N.W.2d at 902, 904 n. 6. Nevertheless, the court of appeals interpreted *Carothers* to mean that we eliminated any duty to retreat when acting in self-defense in one's home. *Glowacki,* 615 N.W.2d at 844–45.

 We explained in *Carothers* that the concept of reasonableness is a critical part of self-defense. 594 N.W.2d at 904. To find that a defendant acted in self-defense, a jury must, as is illustrated by the self-defense statute, Minn.Stat. § 609.06 (2000), find that the defendant reasonably believed that force was necessary and that the defendant used only the level of force reasonably necessary to prevent the harm feared. *State v. Pendleton,* 567 N.W.2d 265, 269 (Minn.1997). In cases where death resulted from self-defense, a defendant must have reasonably feared that he was threatened with great bodily harm or death and that the use of force to prevent that harm was reasonable. *State v. Boyce,* 284 Minn. 242, 259–60, 170 N.W.2d 104, 115 (1969).

Part of our inquiry as to whether Glowacki's actions were reasonable requires us to determine whether he had a duty to retreat from his home and, if so, whether a retreat was reasonably possible before "defending" himself. If Glowacki did not

have such a duty, our reasonableness inquiry would focus only on whether his use of force was reasonable when faced with the threat Andrews presented. On the other hand, if Glowacki did have a duty to retreat, we must consider whether Glowacki could have safely retreated from his home and if we conclude that he could have, his use of force against Andrews would be unreasonable as a matter of law. The state and the MCAA urge us to conclude that there is a duty to retreat when acting in self-defense against a co-resident. Glowacki and MACDL urge us to conclude that there is no such duty.

The minority position among states that have considered the issue is that there is a duty to retreat from the home when acting in self-defense against a co-resident.[3] Both the state and the MCAA argue that the only rule that is consistent with our earlier holdings on the duty to retreat in defense of dwelling claims is one mandating a duty to retreat when the aggressor is a co-resident. The result of such a rule would be that the only time one is *not* required to retreat would be when one is in one's home and is defending oneself, others, or one's dwelling against an intruder. In all other cases, the duty to retreat would apply.

The state argues that this position discourages violence among co-residents. It asserts that the value of human life and the importance of resolving disputes without violence has persuaded courts in many jurisdictions to maintain this duty to retreat. The Connecticut Supreme Court stated that "[t]his rule is in line with a policy favoring human life over the burden of retreating from the home, * * *." *Shaw*, 441 A.2d at 566. In reaching the same conclusion, the District of Columbia

Court of Appeals explained that "all co-occupants, even those unrelated by blood or marriage, have a heightened obligation to treat each other with a degree of tolerance and respect. That obligation does not evaporate when one co-occupant disregards it and attacks another." *Cooper*, 512 A.2d at 1006.

In response to these arguments, Glowacki and the MACDL urge us to conclude, as a majority of other states have, that there is no duty to retreat from the home when acting in self-defense.[4] MACDL argues that public policy and the practical applications of the duty to retreat favor eliminating such a duty when one is acting in self-defense in one's home against a co-resident. This approach establishes a bright-line rule, the administration of which is more precise because under this rule a person *never* has a duty to retreat from the home when defending oneself. Such a rule eliminates the need to define and differentiate between residents, nonresidents, invited guests, unwanted guests, etc., because the status of the aggressor is irrelevant. The present case illustrates the problems with these distinctions because Glowacki claims that Andrews was an intruder, the district court labeled her as an invited guest, and the court of appeals concluded that she was a co-resident. The state effectively concedes in its reply brief that any rule establishing different retreat rules based on the status of the aggressor will require the factfinder to determine the exact status of persons who appear somewhere in between a co-resident and an intruder. The state stated in its reply brief that "seeking to determine an assailant and victim's 'respective relationship to the dwelling in which the dispute arose, * * *' as an issue in assault

**3.** *See* Linda A. Sharp, J.D., Annotation, *Homicide: Duty To Retreat Where Assailant and Assailed Share the Same Living Quarters*, 67 A.L.R.5th 637 (1999).

**4.** *See* Sharp, *supra* note 3.

cases is misguided at best. * * * The difficulty of application of such an approach is obvious. Uniformity of result, free from arbitrary or discriminatory decisions, could not be assured."

There is another argument for the majority position that some states found convincing. It is that a no duty to retreat rule recognizes the realities facing those persons, mostly women, living in situations of domestic violence. When the New Jersey Supreme Court urged the legislature to reconsider the state's statutory duty to retreat, it detailed the incompatibility of the duty to retreat with the ability of an abused spouse to protect herself. *Gartland*, 694 A.2d at 571. The Florida Supreme Court also considered this point in 1999 when it reversed its earlier position and eliminated the duty to retreat from the home. *Weiand*, 732 So.2d at 1051–57 (*reversing State v. Bobbitt*, 415 So.2d 724 (Fla.1982)). The Florida court explained that battered spouses often have retreated in the past, only to be subjected to an increased risk of harm from their abuser. *Id.* at 1053. Additionally, despite clear language in a retreat rule, the complexities of battered spouse syndrome may lead juries to believe that a spouse could have left an abusive spouse at some time, even if she could not have retreated on a particular occasion. *Id.* at 1054. Instructing a jury on a duty to retreat may therefore contradict a battered spouse defense. The Florida court also discounted the assertion that eliminating the duty to retreat will actually increase violence. *Id.* at 1056.

In addition to the increased threat of harm that abused spouses face when retreating from a domestic abuse situation, the duty to retreat also may force an abused spouse to choose between acting against the law or abandoning her children. *Gartland*, 694 A.2d at 570. In a domestic violence situation, if an abused spouse could safely retreat, but could not safely collect her children and retreat, the duty to retreat would require her to retreat alone if her children were not threatened with imminent harm. The result is that an abused spouse with children is forced to choose between staying in the home and acquiescing to the abuse, staying in the home and defending herself, knowing that she will not have a legal defense under the law, or abandoning her children and retreating.

Although the arguments and the circumstances here focus on self-defense, as we recognized in *Carothers*, self-defense in the home and defense of dwelling are often intertwined. Defense of dwelling is a defense based on property rights and thus is only available against one who does not have rights to the dwelling. *State v. Hare*, 575 N.W.2d 828, 832 (Minn.1998). The defense of dwelling defense is not appropriate when the party against whom the force is used has rights to the dwelling as well. *Id.* However, when the defense of dwelling defense is available, there is no duty to retreat from the home before using reasonable force. *Carothers*, 594 N.W.2d at 901.

Although derived from the same common law defense, self-defense in the home is slightly different from defense of dwelling. We require reasonable retreat in self-defense outside the home because the law presumes that there is somewhere safer to go—home. *See id.* at 900. But self-defense in the home is based on the premise that the home is "a place critical for the protection of the family." *Id.* at 901. Requiring retreat from the home before acting in self-defense would require one to leave one's safest place. As Justice Cardozo explained in *People v. Tomlins*, 213 N.Y. 240, 107 N.E. 496 (1914), "[i]t is not now and never has been the law that a man assailed in his own dwelling is bound to retreat. If assailed there, he may stand his ground and resist the attack. He is

under no duty to take to the fields and the highways, a fugitive from his own home. * * * Flight is for sanctuary and shelter, and shelter, if not sanctuary, is in the home." 107 N.E. at 497. The court in *Tomlins* went on to explain that the no retreat from the home rule was the same regardless of whether the aggressor was an intruder or a co-resident. *Id.*

We agree that when acting in self-defense in the home, a person should not be required to retreat from the home before using reasonable force to defend himself, regardless of whether the aggressor is also rightfully in the home. Thus we adopt the following rule: There is no duty to retreat from one's own home when acting in self-defense in the home, regardless of whether the aggressor is a co-resident. But the lack of a duty to retreat does not abrogate the obligation to act reasonably when using force in self-defense. Therefore, in all situations in which a party claims self-defense, even absent a duty to retreat, the key inquiry will still be into the reasonableness of the use of force and the level of force under the specific circumstances of each case.

In the present case, the court gave a modified version of the duty to retreat instruction in CRIMJIG 7.08. The modified instruction did not include the word "retreat," but instead instructed that Glowacki had a duty to "avoid the danger if reasonably possible." While the court did not use the word "retreat" in the instruction, the thrust of the modified instruction could imply that Glowacki had a duty to leave his home if possible before resorting to the use of force in self-defense. The *instruction given may not have been as damaging as if the word "retreat" had*

been used, but the instruction was still erroneous because Glowacki was in his home and he is not required to leave his home before defending himself. Therefore, we hold that the district court erred when it instructed the jury on self-defense in the home.

### III.

Even if the jury instruction given at Glowacki's trial was erroneous, he would only be entitled to a new trial if "it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict." *State v. Olson*, 482 N.W.2d 212, 216 (Minn.1992). On review, it is necessary to view the jury charge as a whole. *See State v. Anderson*, 261 Minn. 431, 435, 113 N.W.2d 4, 7 (1962).

Here, the court did not actually use the word "retreat" in its instruction, although it did state that Glowacki had a duty to avoid the danger. As previously noted, the language in the instruction may still imply that Glowacki could not defend himself without first considering a means of avoiding the conflict, which could have suggested that he needed to flee his home.

In order to find Glowacki guilty of assault and domestic assault, the relevant element that the jury needed to find was that Glowacki intentionally inflicted or attempted to inflict bodily harm on Andrews. Minn.Stat. §§ 609.224, subd. 1(2), 609.2242, subd. 1(2).[5] The law of self-defense provides that Glowacki would not be guilty if he used reasonable force against Andrews to resist the commission of an offense against him. Minn.Stat. § 609.06, subd. 1(3). Even if there is no *duty to retreat, an individual may only use reasonable force based on the circum-*

---

5. Minnesota Statutes § 609.224, subd. 1(2), defines the crime of assault in the fifth degree and states: "Misdemeanor. Whoever does any of the following commits an assault and is guilty of a misdemeanor: * * * (2) intentionally inflicts or attempts to inflict bodily harm upon another."

stances of the situation. *Carothers*, 594 N.W.2d at 904. That one does not have a duty to retreat does not mean that it is acceptable to use whatever force is desired to repel an attack. *Id.* The absence of a duty to retreat affects the duty to act in a reasonable manner only because a defendant's use of force in self-defense may be reasonable even if the defendant does not leave his home. *Id.* A defendant claiming self-defense may use a level of force that is reasonable and only when there is no reasonable alternative to the use of force. *Id.*

At trial the jury heard conflicting testimony as to what happened on the evening of April 8, 1999. Both Glowacki and Andrews made statements that are inconsistent with other evidence presented. Andrews stated that Glowacki kicked her between 50 and 100 times, although the officers who responded to her 911 call acknowledged that her injuries were not consistent with such a brutal attack. On the other hand, Glowacki asserted that he only pushed Andrews to the floor twice. The photographs of Andrews' injuries show bruises on her legs, feet and hand that could possibly have come from two falls to the floor. However, the photos also depict red marks on her neck, which are not explained under Glowacki's scenario of events. Glowacki testified that Andrews struck him on the shoulder and that he feared that she had a weapon behind her back; however, none of the officers who responded to the scene could recall Glowacki mentioning that Andrews had hit or threatened him.

██ Generally, a reasonableness determination is properly made by the finder of fact—in this case, the jury. *Cf. Krafft v. Hirt*, 260 Minn. 296, 301, 110 N.W.2d 14,

18 (1961). However, when no reasonable mind could draw an adverse inference, the question may be decided as a matter of law. *Id.* Taking Glowacki's testimony as true, Glowacki kicked Andrews to the floor after she hit him "in the shoulder a little bit." Glowacki then pushed Andrews to the floor after he "sensed" her behind him and "saw" something moving toward his head. Further, Glowacki offered no explanation for the injuries to Andrews' neck even though they are quite apparent in the photos taken by the police. In light of the force Andrews used, the level of force Glowacki responded with was unreasonable. We conclude as a matter of law that even if the jury accepted Glowacki's version of events, no reasonable juror could conclude that his use of force to defend himself was reasonable. Therefore, we conclude beyond a reasonable doubt that the erroneous instruction did not have a significant impact on the jury's verdict because Glowacki's use of force did not meet the reasonableness requirement of self-defense. We hold that the district court erred in instructing the jury, but the error was harmless and thus, the jury's guilty verdicts for assault and domestic assault are reinstated. We reverse the court of appeals, reinstate the jury's verdicts, and remand to the court of appeals for consideration of the other issues Glowacki raised on appeal.

Reversed and remanded.

GILBERT, J., took no part in the consideration or decision of this case.

Minnesota Statutes § 609.2242, subd. 1(2), defines the crime of domestic assault and states: "Misdemeanor. Whoever does any of the following against a family or household member as defined in section 518B.01, subdivision 2, commits an assault and is guilty of a misdemeanor: * * * (2) intentionally inflicts or attempts to inflict bodily harm upon another."