STATE OF MINNESOTA

IN SUPREME COURT

A22-1424

Court of Appeals                                              Procaccini, J.
                                                    Took no part, Gaïtas, J.
State of Minnesota,

                    Appellant,

vs.                                                    Filed:  October 9, 2024
                                                    Office of Appellate Courts
Julian Daniel Valdez,

                    Respondent.

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Kelsie Kingstrom, Renville County Attorney, Olivia, Minnesota; and

Scott A. Hersey, Special Assistant Renville County Attorney, Saint Paul, Minnesota, for appellant.

Cathryn Middlebrook, Chief Appellate Public Defender, Andrea Barts, Assistant State Public Defender, Saint Paul, Minnesota, for respondent.

Shauna Faye Kieffer, Minneapolis, Minnesota, for amicus curiae Minnesota Association of Criminal Defense Lawyers.

_____

S Y L L A B U S

1.     To justifiably use reasonable force in defense of another under Minnesota

Statutes section 609.06, subdivision 1(3) (2022), a defendant must subjectively believe that

1

the person in peril has no reasonable possibility of safe retreat, and that belief must be objectively reasonable based on the information available to the defendant at the time that they use force to defend the person in peril. The district court abused its discretion by instructing the jury that an element of respondent's defense-of-others claim was that respondent had a duty to retreat and avoid the danger if reasonably possible.

2.     The court of appeals correctly concluded that the district court's erroneous instruction that respondent had a duty to retreat before acting in defense of his stepbrother was not harmless beyond a reasonable doubt and requires a new trial.

Affirmed.

O P I N I O N

PROCACCINI, Justice.

Respondent Julian Valdez was convicted of second-degree unintentional felony murder in violation of Minnesota Statutes section 609.19, subdivision 2(1) (2022), for fatally shooting an unarmed man who was allegedly beating and choking his stepbrother. The court of appeals reversed and remanded, concluding that the district court abused its discretion by instructing the jury that Valdez himself had a duty to retreat before using force in defense of his stepbrother. We agree. We hold that the district court abused its discretion by instructing the jury that an element of Valdez's defense-of-others claim was that Valdez himself had a duty to retreat and avoid the danger if reasonably possible. Further, we cannot conclude that the district court's erroneous instruction was harmless. For these reasons, we affirm the decision of the court of appeals to reverse Valdez's conviction and remand for a new trial.

2

**FACTS**

The State of Minnesota charged Valdez with second-degree intentional murder, Minnesota Statutes section 609.19, subdivision 1(1) (2022), and second-degree unintentional felony murder, Minnesota Statutes section 609.19, subdivision 2(1), in connection with the death of Pablo Gutierrez. Valdez pleaded not guilty and demanded a jury trial. The facts presented at trial included the following.

Throughout the day on August 5, 2021, Valdez and his stepbrother were drinking beer and playing pool in Valdez's detached garage.[1] Valdez and his stepbrother lived together at the home on Main Street in Renville. The stepbrothers often spent time socializing in the garage, where they kept a couch, pool table, TV, flat-top grill, and tables.

That evening, Gutierrez and his sister took a drive in Renville. They stopped at a local Dollar Tree, and Gutierrez completed a purchase at around 8:00 p.m. Afterward, the siblings were traveling down Main Street, discussing the sister's upcoming home remodel, when she gestured toward a dumpster in an alleyway, stating that she would need one during the remodel. Gutierrez looked toward the dumpster, then turned back to his sister and asked, "[W]ait who was that that went like this to me?"—implying that someone outside had made a gesture toward him. Gutierrez appeared confused. His sister then dropped him off at her house. At 8:16 p.m., Gutierrez left the house and walked south down Main Street.

---

[1]  The recitation of facts regarding the events leading up to the shooting, and the shooting itself, stems from the testimony of Valdez, his stepbrother, and Gutierrez's sister.

Gutierrez arrived at Valdez's residence a few minutes later, entered the open garage from the alleyway, and approached Valdez, who at that point was alone in the garage. Valdez did not know Gutierrez personally but knew of him because Gutierrez had gotten into a fight outside of Valdez's garage three years earlier. Gutierrez was sweating, breathing heavily, and seemed aggravated, but did not have any weapons. Gutierrez asked Valdez where the stepbrother was, and Valdez responded that he was inside the house.

Valdez went inside to get his stepbrother, and he also retrieved a gun from a safe in his room. The two men returned to the garage, where Gutierrez still appeared angry. Gutierrez believed that the stepbrother was the person who had gestured toward him earlier in the evening and "wanted to fight," but the stepbrother told Gutierrez that he had just waved. This seemed to calm Gutierrez down. The stepbrother offered Gutierrez a drink, and the men stayed in the garage for the next hour or two.

At 9:48 p.m., about an hour and a half after Gutierrez entered the garage, the stepbrother sent Valdez a Snapchat message, telling Valdez to "record [Gutierrez] on the low" to "video his erratic behavior." Valdez did not record Gutierrez, and neither brother called 911 at that point.

Eventually, Valdez and the stepbrother started to rack the pool table for a game, and Valdez put his gun in the table's cubbyhole. The stepbrothers were talking and laughing, and Gutierrez moved in front of the table and put a "mean face" on, seemingly thinking that the stepbrothers were talking about him. Gutierrez began cursing at them. The pool table separated Valdez from Gutierrez, but there was nothing separating the stepbrother from Gutierrez. The stepbrother stood between Gutierrez and the open garage door.

4

Gutierrez threatened to kill the stepbrothers, and Valdez responded by yelling at Gutierrez to get out, grabbing his gun, and moving around the pool table. Valdez did not point the gun at Gutierrez but made it visible to him. Gutierrez began swearing at Valdez, calling him a "b**** a** n*****" and asking, "[W]hat the f*** you gonna do with that?" Valdez told Gutierrez to get "the f*** out of here," and Gutierrez replied, "[F]*** you," and stated, "I can see right through you[,] you scared." Gutierrez threatened to jump the pool table, "b**** slap" Valdez, take the gun, and shoot Valdez in the head with it. The stepbrother was standing just a few feet from Gutierrez, telling him to "calm down, bro." Gutierrez responded, "I ain't your f***** bro b****. I'll f***** kill you too."

Gutierrez lunged at the stepbrother, and the stepbrother fought back with a pool cue, swinging it as hard as he could—"like a baseball bat"—and striking Gutierrez's ear. Gutierrez staggered back but then continued to come at the stepbrother. The two stumbled out of the garage, where the backwards-facing stepbrother tripped on a pile of trash. Gutierrez tackled the stepbrother, landing on top of him. Valdez knew that Gutierrez was unarmed but testified that Gutierrez was choking the stepbrother and that the stepbrother was yelling "shoot him." The stepbrother testified that Gutierrez was trying to "smother" his face and neck, that Gutierrez struck his face with a closed fist, and that he "begged" Valdez to shoot Gutierrez because he was scared for his life.

Valdez came out of the garage into the alleyway and shot Gutierrez once in the side. Gutierrez got up and yelled, "[H]e shot me!" Valdez responded, "I told you to f****** leave." Gutierrez turned around, stumbled, fell to the ground, and did not get up again. Valdez yelled at the stepbrother to call the cops, placed his gun on the table, and then called

his mother. At 10:13 p.m., the stepbrother called 911. When paramedics arrived, Gutierrez was not breathing and had no pulse. A helicopter landed at a local baseball field to medevac Gutierrez, but when the ambulance carrying Gutierrez arrived to meet the helicopter, the flight crew pronounced him dead.

According to the medical examiner, Gutierrez suffered an entrance wound on his right upper back and an exit wound on the left side of his chest. He also had a blunt-force injury to the left side of his head and shoulder, which lacerated his ear and caused external bruising. A toxicology report revealed that Gutierrez had methamphetamine in his system when he died. Methamphetamine is a stimulant that can cause rapid speech, excitement, sweating, and aggression.

When asked whether he could have done anything other than shoot Gutierrez, Valdez stated that he probably could have hit him, but that doing so would not have been effective given that the stepbrother had failed to stop Gutierrez with the pool cue. And, at the time, Valdez wore a wrist brace to treat his tendonitis, which would have made it painful for him "to use . . . force to try to stop [Gutierrez] that way." Valdez also conceded that he could have kicked Gutierrez. Valdez testified that he, personally, could have run away, but chose not to leave his stepbrother. Valdez testified that he is "way bigger" than his stepbrother and that Gutierrez is about his size or maybe "a little taller."

The stepbrother conceded that he could have run away at some point during the two hours preceding the altercation and when Gutierrez initially started coming at him, but not after Gutierrez tackled him. He also testified that Gutierrez is much bigger than him and that Gutierrez placed all his weight and pressure on him after tackling him. The stepbrother

6

did not testify that he could have retreated when Gutierrez was on top of him and Valdez fired the fatal shot.

Valdez's neighbor—who lives across the alleyway and had a view into the open garage—offered a different account of the shooting. The neighbor testified that he and his children woke up to shouting and that he looked out his back window to see Valdez shoot Gutierrez in the back as Gutierrez was running away.

Before trial, Valdez requested jury instructions on self-defense and defense of others. Valdez asked that the district court instruct the jury that he had no duty to retreat, as he "was acting in defense of his [stepbrother] . . . and [the stepbrother] was not able to retreat." The court held a hearing on the motion and ultimately deferred ruling on whether Valdez was entitled to the requested instructions, but the court also stated that, if the instructions were given, they would include the duty to retreat.

After the defense rested, the parties agreed, and the district court concluded, that Valdez had met his burden to receive jury instructions on self-defense and defense of others. The defense then asked the court to reconsider its earlier ruling that Valdez had a duty to retreat. The court concluded that the duty to retreat would be included in both instructions, and that the jury would need to find that the ability to retreat was not available to Valdez "because of danger."

The jury instruction on defense of others included the following:

**First**: No crime is committed when a person uses reasonable force to resist or to aid another person in resisting an offense against the person, if such an offense was being committed or the person reasonably believed that it was. . . . **Second**: . . . . [In defending against the attack,] the person may use all force and means that the person reasonably believes to be necessary and

7

that would appear to a reasonable person, in similar circumstances, to be necessary to prevent an injury that appears to be imminent. . . . **Third**: . . . . A person may use force in defense of self or others only if the person was not the aggressor and did not provoke the offense. **Fourth**: The Defendant has a duty to retreat or avoid the danger if reasonably possible.[2]

The jury found Valdez not guilty of second-degree intentional murder but guilty of second-degree unintentional felony murder. The district court convicted Valdez of that charge and sentenced him to 150 months in prison.

Valdez appealed, arguing that the district court abused its discretion by instructing the jury that he had a duty to retreat before acting in defense of others and that this error was not harmless. The court of appeals reversed Valdez's conviction and remanded the case for a new trial. *State v. Valdez*, 997 N.W.2d 557, 566 (Minn. App. 2023). The court concluded that the jury instruction was inconsistent with the statutory right to use reasonable force in defense of others—the "practical effect" of which would have been that Valdez was required to abandon his stepbrother and leave him in danger of bodily harm or death. *Id.* at 563–64. The court of appeals also concluded that the error was not harmless, as it was impossible to know whether the jury's verdict was attributable to Valdez's non-retreat or to one of the other requirements for a defense-of-others claim. *Id.* at 566.

---

[2] The district court's instruction on this defense is similar to a model jury instruction that applies the duty to retreat to defense of others. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice: Jury Instruction Guides—Criminal*, CRIMJIG 7.13 (6th ed. 2022). At the time of trial, the relevant model instruction was found at section 7.13 of the Criminal Jury Instruction Guide (CRIMJIG). Following a more recent update, the model instruction for the same defense is currently found in section 6.10. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice: Jury Instruction Guides—Criminal*, CRIMJIG 6.10 (7th ed. 2023). The current version of the model instruction places brackets around the duty to retreat element and attributes this change, in part, to the court of appeals decision in this case.

One member of the court of appeals panel concurred, "writ[ing] separately to highlight concerns about the state's argument that it had disproved other elements of Valdez's defense-of-others claim by demonstrating (1) that Valdez became the aggressor or provoked Gutierrez by displaying his pistol while telling Gutierrez to leave the garage, and (2) that the force used by Valdez against Gutierrez was unreasonable." *Id.* at 566 (Kirk, J., concurring specially).

We granted the State's petition for review.

**ANALYSIS**

We first address whether the district court abused its discretion by instructing the jury that Valdez had a duty to retreat before using force to defend his stepbrother. Because we conclude that the district court abused its discretion by so instructing the jury, we then decide whether reversal of Valdez's conviction and a new trial are necessary because it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict.

I.

Our Legislature has codified the right to use force in defense of others at Minnesota Statutes section 609.06, subdivision 1(3) (2022).[3] That subdivision provides, in part, that reasonable force may be used upon another without the other's consent "when used by any person in resisting or *aiding another* to resist an offense against the person." *Id.* (emphasis

---

[3] Minnesota Statutes section 609.065 (2022) also addresses the intentional taking of a life when done in defense of another. Because the jury acquitted Valdez of second-degree intentional murder, we limit our discussion to the defense of others found in Minnesota Statutes section 609.06, subdivision 1(3).

added). We have read the *self*-defense provision in section 609.06 to include four elements that inform whether a defendant's use of force was reasonable:

> (1) the absence of aggression or provocation on the part of the defendant; (2) the defendant's actual and honest belief that he or she was in imminent danger of death or great bodily harm; (3) the existence of reasonable grounds for that belief; and (4) the absence of a reasonable possibility of retreat to avoid the danger.

*State v. Basting*, 572 N.W.2d 281, 285 (Minn. 1997). To this end, "[a] defendant claiming self-defense may use a level of force that is reasonable" under the circumstances. *State v. Glowacki*, 630 N.W.2d 392, 403 (Minn. 2001). When a defendant meets the burden of presenting evidence to support a self-defense claim, "the State bears the burden to disprove, beyond a reasonable doubt," at least one of the elements of self-defense. *State v. Devens*, 852 N.W.2d 255, 258 (Minn. 2014) (citing *Basting*, 572 N.W.2d at 286).

## A.

The question in this case is whether the fourth element of a *self*-defense claim—the duty to retreat—applies to a defense-*of-others* claim. In self-defense cases, we have held that a person is required to retreat if reasonably possible before acting in self-defense.[4] *Id.* But we have not yet decided whether the duty to retreat extends to circumstances where a defendant acts in defense *of another person*. And while we have generally stated that a

---

[4] The notable exception is the "castle doctrine," which provides that a person has no duty to retreat from their home before acting in self-defense. *See State v. Johnson*, 719 N.W.2d 619, 622, 629 (Minn. 2006) (rejecting a duty to retreat before acting in self-defense where the shooting occurred in the upstairs bedroom of the defendant's home); *State v. Carothers*, 594 N.W.2d 897, 900 (Minn. 1999) (noting that "early Minnesota caselaw rejected a duty to retreat in cases of self-defense occurring in one's home"). Valdez has not argued before us that the castle doctrine applies to his case, so we do not analyze whether that doctrine is applicable here.

defense-of-others claim "parallels" self-defense, we have not had occasion to consider the duty to retreat in this context. *See State v. Richardson*, 670 N.W.2d 267, 278 (Minn. 2003) (stating that justification for homicide in defense of others parallels self-defense when concluding the district court did not abuse its discretion by excluding character evidence about the victim); *State v. Granroth*, 200 N.W.2d 397, 399 n.2 (Minn. 1972) (using the same language when concluding that any error in jury instructions on self-defense and defense of others defining great bodily harm was harmless).

A defendant's duty to retreat creates inherent tension with the statutory right to defend another. Even if a *defendant* can retreat, the person in need of help (the person in peril)[5] may not be able to do so. Imposing a duty to retreat on the defendant in those circumstances would require the defendant to abandon the person in peril, defeating the very purpose of a defense-of-others claim. On this point, a leading treatise on criminal law notes that the duty to retreat element of a self-defense claim cannot be perfectly transposed onto a defense-of-others claim:

> Because some jurisdictions have adopted a retreat rule with respect to the defense of self defense, often in statutory provisions which also extend to defense of third parties, this rule is sometimes applicable . . . [to defense of others] as well. *It is apparent, however, that the retreat alternative must be assessed somewhat differently here*. To take the most obvious case, *surely the ability of the defendant to retreat without risk to himself should not*

---

[5] We refer to the person whom the defendant seeks to defend in a defense-of-others scenario as the "person in peril." This phrase operates equally well in a self-defense scenario as, under those circumstances, the defendant and the person in peril are one and the same.

11

*control when the force is being used to protect another party who cannot retreat.*

2 Wayne R. LaFave, *Substantive Criminal Law* § 10.5(c), at 227 (3d ed. 2018) (emphasis added).

Other state appellate courts have likewise concluded that it is not sensible to focus on a defendant's own ability to retreat when they assert that they used force in defense of others and have instead reasoned that the focus should be on the *person in peril's* ability to retreat. *See Commonwealth v. Allen*, 48 N.E.3d 427, 435 (Mass. 2016) (noting "the incompatible nature of intervention and retreat" with respect to defense of others); *State v. Silveira*, 503 A.2d 599, 608 n.6 (Conn. 1986) (stating that "requiring a defendant acting in defense of another to retreat, without regard to the ability to retreat of the person defended, would be inconsistent with the general right to defense of others"); *see also Cleveland v. State*, 700 S.W.2d 761, 762 (Tex. App. 1985)[6] (noting that "if the actor is acting in defense of third persons, it is the position of the third person that is relevant").

And, although we have never addressed the issue presented here, we have concluded that the duty to retreat is incompatible with a similar defense. Recognizing that there is no duty to retreat when acting in defense of one's dwelling, we stated that a person's "authority to prevent the commission of a felony in one's home" and our recognition of "the sanctity

---

[6]     Texas opinions relevant to this issue were published when Texas law provided that, to establish a defense-of-others defense, a defendant needed to prove, among other things, that "a reasonable person in the actor's situation would not have retreated." Tex. Penal Code § 9.32(2) (1984). That statute was amended in 2007 to expressly provide that, so long as certain conditions are satisfied, there is no duty to retreat from a threat of unlawful force. Acts 2007, 80th Leg., ch. 1, § 3 (eff. Sept. 1, 2007) (codified as amended at Tex. Penal Code § 9.32(c) (2022)).

of the home" were "logically incompatible with a duty to retreat, which would effectively preclude a person from preventing a felony in the home" and "force people to leave their homes by the back door while their family members are exposed to danger." *State v. Carothers*, 594 N.W.2d 897, 901 (Minn. 1999). Similarly, the right to defend another is logically incompatible with imposing a duty to retreat on the defendant.

For the above reasons, we conclude that the district court abused its discretion by instructing the jury that Valdez himself had a duty to retreat before acting in defense of his stepbrother. But this conclusion does not end our analysis. To say that a *defendant* does not have a duty to retreat before acting in defense of another is not to say that a *person in peril's* ability to retreat safely is irrelevant. To the contrary, as discussed below, the person in peril's ability to retreat safely is an important factor in assessing the reasonableness of the defendant's actions.

B.

In considering the impact of the person in peril's ability to retreat safely on a defense-of-others claim, we are mindful that—as with self-defense—the touchstone of the analysis is *reasonableness*. A defendant may only use "*reasonable* force" when "the actor *reasonably* believes" its use is necessary to aid another in "resisting . . . an offense against the person." Minn. Stat. § 609.06, subd. 1(3) (emphasis added). And we have previously acknowledged that a duty to retreat relates to "the concept of reasonableness" found in section 609.06, subdivision 1. *See Glowacki*, 630 N.W.2d at 399 (stating that "[p]art of our inquiry as to whether [the defendant's] actions were reasonable requires us to determine whether he had a duty to retreat from his home" before acting in self-defense against a

13

co-resident). In the self-defense context, we have held that it is unreasonable as a matter of law to use force if the defendant can retreat safely. *Id.* at 400 (noting that, if the defendant had a duty to retreat and could have safely retreated, then his use of force would have been unreasonable as a matter of law).[7] This makes sense because, in a *self*-defense case, the defendant and the person in peril are one and the same.

But, as discussed above, imposing a duty to retreat on the defendant is logically incompatible with a defense-*of-others* claim because, in such a claim, the person in peril is not the defendant, but rather a third person whom the defendant sought to defend. To remedy this incompatibility, we conclude that a defendant's use of force in defense of another to be reasonable, the *person in peril* must not have had a reasonable possibility of safe retreat.[8] And we further hold that, to determine whether the person in peril had a reasonable possibility of safe retreat, the person in peril's ability to retreat must be assessed from the perspective of the defendant. An alternative formulation that retroactively places the defendant in the shoes of the person in peril would impose an unrealistic burden on the defendant.

In sum, to justifiably use force in defense of another under section 609.06, subdivision 1(3), a defendant must subjectively believe that the person in peril has no

---

[7]    As discussed above, the notable exception to this rule is the "castle doctrine." *See Johnson*, 719 N.W.2d at 629.

[8]    Our emphasis on the person in peril's ability to retreat is consistent with our precedent noting that a defense-of-others claim "parallels" a self-defense claim. *See Richardson*, 670 N.W.2d at 278; *Granroth*, 200 N.W.2d at 399 n.2; *see also Carothers*, 594 N.W.2d at 899 ("Minnesota has recognized that a person who kills another in self-defense must have attempted to retreat if reasonably possible.").

14

reasonable possibility of safe retreat, and that belief must be objectively reasonable based on the information available to the defendant at the time that they use force to defend the person in peril.

II.

Next, we must determine whether the district court's erroneous jury instruction was harmless, or if it requires a reversal of Valdez's conviction and a new trial. A defendant is entitled to a new trial due to an erroneous jury instruction if "it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict." *Glowacki*, 630 N.W.2d at 402 (citation omitted) (internal quotation marks omitted). "On review, it is necessary to view the jury charge as a whole." *Id.*

The State argues that any error in the jury instruction had no significant impact on the verdict because the State disproved the other elements of Valdez's defense-of-others claim by showing that the amount of force used by Valdez was unreasonable and that Valdez provoked Gutierrez by displaying his firearm.[9] Valdez counters that because the jury was instructed that he had a duty to retreat—and he conceded at trial that he could have retreated—the jury did not reach the other elements of his defense-of-others claim, and the district court's erroneous instruction therefore had a significant impact on the verdict. On this issue, the parties primarily dispute how two of our cases—*Glowacki*,

---

[9] Here, the parties dispute only whether the district court correctly instructed the jury on the duty to retreat element of defense of others. They do not challenge the district court's instructions on any other element of Valdez's defense-of-others claim. For this reason, the instructions on the other elements of a defense-of-others claim are not before us, and we express no view on their propriety.

15

630 N.W.2d at 402–03, and *State v. Baird*, 654 N.W.2d 105, 114 (Minn. 2002)—affect our analysis.

The State argues that *Glowacki* controls and that no reasonable jury could have concluded that Valdez's use of deadly force was reasonable, regardless of the erroneous instruction. In *Glowacki*, we concluded that an erroneous jury instruction had no significant impact on the verdict because, even when crediting the defendant's version of events, no reasonable jury could have found that the State did not disprove another element of his self-defense claim. 630 N.W.2d at 403. Specifically, we determined that the force used by the defendant in self-defense was unreasonable as a matter of law. *Id.*

Valdez counters that our decision in *Baird* controls, because it is impossible to know the basis of the jury's decision to reject his defense-of-others claim, and—crediting Valdez's version of events—a reasonable jury could have found that the State did not disprove the other elements of the claim. In *Baird*, we held that the district court erroneously instructed the jury that the defendant had a duty to retreat from his home before acting in self-defense. 654 N.W.2d at 113. In that case, the State argued that the error had no significant impact on the verdict because Baird used an excessive amount of force—continuing to beat the victim even after a screwdriver had been removed from the victim's hand—and this showed that a jury could not have found that he acted in self-defense. *Id.* at 114. But because there was evidence that the victim was holding the screwdriver at the time of the initial attack, we concluded that a reasonable jury could have found that Baird acted in self-defense. *Id.* It was "simply impossible to determine whether the jury rejected Baird's version of the facts" or accepted his version but found that he was guilty because

16

he failed to retreat. *Id.* And it was possible that, had the jury known that Baird did not have a duty to retreat, it would have decided that his actions were reasonable and taken in self-defense. *Id.* We therefore determined that there was a reasonable likelihood that the error had a significant prejudicial impact on the jury's verdict. *Id.*

We agree with Valdez that the analysis in *Baird* is most applicable here. At trial, the State and Valdez presented different versions of what happened in the garage, but even under Valdez's account, he admitted that he could have retreated.[10] And the fact that the State's closing argument emphasized that Valdez had a duty to retreat and failed to do so also supports the conclusion that the district court's duty-to-retreat instruction had a significant impact on the jury's verdict. *See State v. Guzman*, 892 N.W.2d 801, 816 (Minn.

---

[10] Valdez's stepbrother, the person in peril, also testified that he could have retreated when Gutierrez initially attacked him—a point in time before Gutierrez tackled the stepbrother and Valdez used of force. This concession does not affect our harmless error analysis for two reasons.

First, in determining the reasonableness of Valdez's conduct, the fact-finder must focus on the moment that the defendant elected to use force. *Cf. State v. Edwards*, 717 N.W.2d 405, 413 (Minn. 2006) (stating that the "duty to retreat relates to the election to kill, making a killing unjustified if the danger was reasonably avoidable," and that the defendant's self-defense claim failed where he had an opportunity to retreat when he shot the victim while the defendant "was in the driver's seat of the van that was stopped in the middle of the street, the engine was running, nothing was blocking his exit, and [the victim] was on foot outside"); *State v. Austin*, 332 N.W.2d 21, 24 (Minn. 1983) (holding that the defendant's use of force was unjustified because he had "options for escape or avoidance of peril . . . rather than directly confronting" the victim). Accordingly, evidence that the stepbrother may have been able to retreat *before* Gutierrez tackled him does not foreclose Valdez's defense.

Second, as discussed above, Valdez's defense-of-others claim turns on whether he *reasonably believed* that his stepbrother had an opportunity to safely retreat when Valdez elected to use force, and that question is best left to the fact-finder. *Glowacki*, 630 N.W.2d at 403 ("Generally, a reasonableness determination is properly made by the finder of fact— in this case, the jury.").

17

2017) (holding that an allegedly erroneous jury instruction was harmless in part because "during closing argument, the prosecutor never referenced the [challenged] language of the jury instruction"). Under these circumstances, we cannot determine whether the jury rejected Valdez's version of events or instead accepted his version but nonetheless found that he was guilty because he failed to retreat. Because it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict, we conclude that the error was not harmless. For this reason, Valdez should be given the opportunity to present his defense to a jury with proper instructions.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.

GAÏTAS, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

18