*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1259**

State of Minnesota,
Respondent,

vs.

Eddie Niles Hubbard,
Appellant.

**Filed August 10, 2015
Affirmed
Peterson, Judge**

Hennepin County District Court
File No. 27-CR-13-14966

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Elizabeth R. Johnston, Assistant
County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Sara J. Euteneuer, Assistant
Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Peterson, Judge; and Johnson,

Judge.

**U N P U B L I S H E D   O P I N I O N**

**PETERSON**, Judge

In this appeal from convictions of first-degree manslaughter and second-degree

assault, appellant argues that (1) the manslaughter conviction must be reversed because

the evidence was insufficient to prove that he intended to cause the victim's death and that he was not acting in self-defense; (2) the assault conviction must be reversed because the evidence was insufficient to prove that he intended to cause the victim fear of immediate bodily harm or death; (3) the district court denied him a meaningful opportunity to present a complete defense; (4) the district court erred in instructing the jury on self-defense; and (5) evidence of other bad acts was irrelevant and not probative and, therefore, should have been excluded. We affirm.

## FACTS

J.C. died of a gunshot wound inflicted by appellant Eddie Niles Hubbard in the presence of K.S. and her four minor children.[1] Appellant was charged with second-degree intentional murder in violation of Minn. Stat. § 609.19, subd. 1(1) (2012), and four counts of second-degree assault in violation of Minn. Stat. § 609.222, subd. 1 (2012).

Appellant had known J.C. since at least 2008 or 2009 and had initially acted as a mentor to him. J.C. and K.S. met and began dating during the spring of 2011, and a few months later, J.C. moved into K.S.'s residence. After K.S. had to leave her residence in July 2011, she, J.C., and the four children stayed with appellant off and on for several months. In April 2013, they began staying with appellant again.

During the week before the shooting, J.C. and appellant argued repeatedly, and appellant said that he wanted J.C., K.S., and the children to move out of his house. J.C.,

---

[1] Two of the children were also J.C.'s children.

2

K.S., and the children stayed with K.S.'s mother from Sunday, May 5 through Tuesday, May 8, 2013. On Wednesday, May 9, 2013, J.C. told K.S. that they could return to appellant's house and that appellant had left a key for them in the usual place. When they returned, appellant refused to allow them inside; he told J.C. that he would pack his stuff for him and J.C. could come back and get it. J.C. said that he would pack his own stuff and went to the back of the house to look for the key. When J.C. returned to the front of the house, he was holding a brick and said that appellant had called some people to come over and do something to him. K.S. told J.C. to put the brick down, and he did. The police came, and J.C., K.S., and the children left and went to a nearby park. Appellant texted J.C. asking where they were. J.C. replied that they were at the park, and appellant came to the park and picked them up. Appellant dropped K.S. and the children off at his house, and he and J.C. left and were gone for about three hours. When J.C. returned, he told K.S. that they could stay at appellant's house through the end of the month.

On May 10, 2013, appellant texted K.S. that he was very unhappy and wanted them to leave. K.S. was tired of appellant's continually changing attitude, so she told J.C. that they needed to go and stay in a hotel until they could find a place of their own. K.S. and J.C. were in the upstairs bedroom that they used. After reading the text-message exchange between K.S. and appellant, J.C. went downstairs to talk to appellant. K.S. did not hear any raised voices or yelling while appellant was downstairs. When J.C. came back upstairs, he said that appellant wanted them to pack their belongings and leave. J.C. went downstairs to return a knife, which appellant had given K.S. earlier in the day to hold onto for appellant, and then came back upstairs with plastic bags to use for packing.

3

Appellant stayed downstairs and began yelling up the stairs at J.C. and K.S. Appellant called J.C. derogatory names and said, "Oh, now you're in a rush to leave. Well, hurry up, rush then and pack your stuff." Appellant complained about J.C. declining to go to the pharmacy with him. For the most part, J.C. did not say anything back and just ignored appellant. When appellant complained about J.C. not going to the pharmacy, appellant said that they had to pack. Appellant then said, "Well, you have a knife. Why don't you come down here and use it!" J.C. replied, "No, I do not have a knife. You do. I put it back."

One of the children, who was standing at the top of the stairs, said that appellant had a gun. Appellant accused J.C. of having a gun too, but J.C. said that he did not have one. K.S. testified that she and J.C. did not keep any firearms, knives, or other weapons in the bedroom that they used. A second child who was standing at the top of the stairs asked appellant if he was going to kill K.S. or J.C. Appellant said, "No." J.C. had the children who were at the top of the stairs come into the bedroom with him, K.S., and the younger children.

Appellant came upstairs and stood in the bedroom doorway. As K.S. turned away from appellant to continue packing, she felt something pushing hard on her back. She turned and looked back and saw that it was a black shotgun. K.S. began crying and begged appellant to put the gun down. As K.S. walked from side to side, appellant followed her movements with the gun. K.S. walked over to where J.C. was standing, and appellant lowered the gun. Appellant said to J.C., "You can talk to this b…ch but you can't talk to me? What, I'm not good enough for you? You can't even come to the

pharmacy with me?"  J.C. replied that he was packing as appellant had requested. Appellant raised the gun, pumped it, and moved the barrel back and forth, alternately pointing it at K.S. and J.C.  J.C. yelled at appellant to put the gun down, and appellant pulled the trigger, fatally shooting J.C. in the abdomen.  K.S. had been standing right next to J.C., and her back was spattered with his blood.  K.S. testified that she did not see a weapon in J.C.'s hand and did not see J.C. threaten or make any movement toward appellant.

Appellant, who was shaking badly and still had the gun in his hand, walked over to K.S. and said, "It was an accident, say it was an accident!"  Appellant then pointed the gun at K.S., who was holding her children on her lap, and said, "You better tell the police it was a f…ing accident."  K.S. promised to do so, and appellant ran out of the room. K.S. called 911 as soon as appellant left the room.  When police arrived a few minutes later, appellant had fled from the house.  Shortly after the shooting, appellant gave varying accounts of it to a 911 operator and friends.

Hennepin County Sheriff's Crime Scene Investigator Devan McNamara was the primary crime-scene investigator for the shooting.  She testified that the house contained a laptop computer and a desktop computer.  The crime-scene team did not seize either of the computers during a search on May 10 because the search warrant did not authorize their seizure.  The shotgun was not found.

Minneapolis Police Sergeant Robert Dale, who worked in the homicide unit, was assigned to investigate the shooting.  At some point during the investigation, Dale learned that appellant's garage had not been searched during the May 10 search.  Dale obtained a

5

search warrant to search the garage and to search the house again. The search warrant for this second search authorized seizure of the computers. When Dale executed the warrant on June 12, 2013, he found the house in a state of disarray. There were broken windows, and individuals were loading a moving van with items from the house. Dale stopped the individuals from removing items from the house and searched the house and garage but did not find the computers or the shotgun.

The district court allowed the state to present evidence of an assault that appellant committed against J.K., who was a former roommate. J.K. and appellant grew up in the same household and lived together as adults during 2010 and 2011. In May 2011, J.K. decided to move out because she and appellant were arguing and having disputes about household expenses. On May 14, 2011, after J.K. told appellant that she would be moving out, appellant confronted her about a bill. J.K., who was trying to get to work on time, said that it was not a good time to discuss the issue. Appellant became upset and demanded that J.K. give him her house keys. Appellant then pushed J.K. to the floor and kicked her in the side. During the assault, appellant was yelling that he wanted J.K. out of the house. J.K. tried to leave, but appellant prevented her from doing so. The assault lasted for 15 to 20 minutes, until J.K. managed to get out of the house and into the yard.

In addition to the charged offenses, two lesser included offenses were submitted to the jury. The lesser included offenses were first-degree intentional manslaughter in violation of Minn. Stat. § 609.20(1) (2012) and second-degree unintentional murder in violation of Minn. Stat. § 609.19, subd. 2(1) (2012). The jury found appellant guilty of first-degree manslaughter and one count of second-degree assault and not guilty of the

6

remaining charges. The district court sentenced appellant to an executed prison term. This appeal followed.

**D E C I S I O N**

**I.**

When considering a claim of insufficient evidence, we conduct "a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach their verdict." *State v. Caine,* 746 N.W.2d 339, 356 (Minn. 2008) (quotation omitted). We must assume that "the jury believed the State's witnesses and disbelieved the defense witnesses." *State v. Tscheu,* 758 N.W.2d 849, 858 (Minn. 2008). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the crime charged. *Bernhardt v. State,* 684 N.W.2d 465, 476-77 (Minn. 2004).

We apply an elevated, two-step process in reviewing a conviction based on circumstantial evidence. *State v. Nelson,* 812 N.W.2d 184, 188 (Minn. App. 2012). "The first step is to identify the circumstances proved." *State v. Silvernail,* 831 N.W.2d 594, 598 (Minn. 2013). In doing so, we "defer to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *Id.* at 598-99 (quotation omitted). Second, we "examine independently the reasonableness of all inferences that might be drawn from the circumstances proved" to "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt, not simply

7

whether the inferences that point to guilt are reasonable." *Id.* at 599 (quotations omitted). We give no deference to the jury's choice between reasonable inferences. *Id.*

### A.

A person is guilty of first-degree manslaughter if he "intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances." Minn. Stat. § 609.20(1). "'Intentionally' means that the actor either has a purpose to do the thing or cause the result specified or believes that the act performed by the actor, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(3) (2012). Intent is "an inference drawn by the jury from the totality of circumstances." *State v. Fardan*, 773 N.W.2d 303, 321 (Minn. 2009) (quotation omitted). "Intent may be proved by circumstantial evidence including the defendant's conduct" and "may be inferred from events occurring before and after the crime." *Davis v. State*, 595 N.W.2d 520, 525-26 (Minn. 1999). The "jury may infer that a person intends the natural and probable consequences of his actions and a defendant's statements as to his intentions are not binding on the jury if his acts demonstrated a contrary intent." *State v. Cooper*, 561 N.W.2d 175, 179 (Minn. 1997).

Appellant argues that a reasonable rational inference from the circumstances proved is that appellant did not intend to fire the gun. Appellant contends that K.S.'s testimony that she did not see J.C. lunge at appellant "was consistent with physical evidence that the blood staining was only on K.S.'s back, suggesting that she could not have actually witnessed the moment the shot was fired because her back was turned." K.S. testified:

Q . . . You said that the defendant pumped the gun?
A Yes.
Q Did you see him do that?
A Yes.
Q And can you just show us by gesturing how he did that?
A He went like this [indicating]. I don't really know how you do it.
Q Okay, and just for the record, you had kind of made the motion of holding the grip with your left hand and you kind of did an up and down gesture?
A Yes.
Q And you observed that?
A Yes.
Q Were you able to hear it?
A Yes.
Q Okay, and you said that was about fifteen seconds before what exchange?
A Before [J.C.] had said – when [appellant] did that is when [J.C.] said, "What are you doing? My kids are right here, my family is right here. Put the gun down!" And then he pulled the trigger right after [J.C.] said it.

The only reasonable inference from K.S.'s testimony is that she saw appellant pull the trigger. J.C. flew backward when he was shot, and appellant cites no evidence that the lack of blood splatter on K.S.'s front was inconsistent with her having been standing next to J.C. and facing appellant.

Appellant came upstairs with a loaded shotgun, stood within two or three feet of appellant, pumped the shotgun, aimed it at J.C.'s midsection as shown by the shot's entry point and K.S.'s testimony that appellant alternately aimed the gun at her and at appellant, and pulled the trigger. The natural and probable consequence of these actions was to kill J.C. *See State v. Chuon*, 596 N.W.2d 267, 271 (Minn. App. 1999) (concluding that a single shot fired at a victim's vital organs from a moving car was sufficient to establish intent to kill), *review denied* (Minn. Aug. 25, 1999). Appellant's statements to

9

the child that he did not intend to kill J.C. or K.S. and J.C.'s belief that appellant would not shoot him were not binding on the jury.

In addition to appellant's actions, there was evidence that appellant was angry at J.C. and jealous of J.C.'s relationships with K.S. and with another man. Appellant's conduct after the shooting is also probative of intent. Appellant pointed the gun at K.S., who was holding her children on her lap, and said, "You better tell the police it was a f…ing accident." Appellant did not attempt to give any aid to J.C. and, instead, fled from the house, delayed about four minutes before calling 911, and gave inconsistent accounts of the shooting to the 911 operator and three others. *See State v. Yang*, 774 N.W.2d 539, 562 (Minn. 2009) (citing defendant's fleeing the scene and failing to render aid to the victim as evidence supporting finding of premeditation).

Appellant's recitation of the facts and argument that a reflex movement is not intentional suggest that the gun may have discharged accidentally. But based on the evidence in the record, an accidental discharge is not a reasonable inference. The evidence is not consistent with any rational hypothesis other than that appellant deliberately pulled the trigger and shot J.C., and appellant's deliberate action is sufficient to prove intent beyond a reasonable doubt.

In his reply brief, appellant argues that the state shifted the burden of proof to appellant by arguing that because no firearm was found at the scene, it was reasonable to infer that the shooting was intentional. But other conduct by appellant after the shooting indicated his guilt, and K.S.'s testimony was extremely strong evidence that appellant acted deliberately. Therefore, even if the state's argument was improper, the jury's

10

verdict was surely unattributable to the error, and any error was harmless beyond a reasonable doubt. *See State v. Mayhorn*, 720 N.W.2d 776, 785 (Minn. 2006) (stating that if the state has engaged in misconduct, defendant will not be granted new trial if misconduct is harmless beyond a reasonable doubt, and misconduct is harmless beyond a reasonable doubt if verdict rendered was surely unattributable to misconduct).

Appellant also objects to the state's argument on appeal about the lack of evidence that the shotgun discharged accidentally. Appellant argues that "[i]t is the state's burden to prove that the shooting was intentional and not accidental, and [appellant] is not required to testify to prove that it was an accident." But the gist of the state's argument is that nothing in the circumstances proved made it reasonable for the jury to infer that the gun discharged accidentally. In light of K.S.'s eyewitness testimony, which we must assume the jury believed, an inference that the shotgun discharged accidentally would be nothing more than speculation without some evidence that would explain an accidental discharge; it would not be a reasonable inference. The state's argument did not shift the burden of proof. *See Tscheu*, 758 N.W.2d at 859 (stating that conviction based on circumstantial evidence will not be overturned on the basis of mere conjecture).

**B.**

Appellant argues that his manslaughter conviction must be reversed because the evidence was insufficient to prove that he did not act in self-defense. A person is not guilty of a crime if he used reasonable force to resist an offense against him. Minn. Stat. § 609.06, subd. 1(3) (2012).

11

> A valid claim of self-defense requires the existence of four elements: (1) the absence of aggression or provocation on the part of the defendant; (2) the defendant's actual and honest belief that he was in imminent danger of death or great bodily harm; (3) the existence of reasonable grounds for that belief; and (4) the absence of a reasonable possibility of retreat to avoid the danger. Although the defendant must come forward with evidence to support his claim, it is the State that bears the ultimate burden of disproving self-defense. To meet its burden, however, the State need only disprove beyond a reasonable doubt at least one of the elements of self-defense.

*State v. Radke*, 821 N.W.2d 316, 324 (Minn. 2012) (citations omitted) (footnote omitted). The fourth element does not apply when acting in self-defense in one's home. *State v. Glowacki*, 630 N.W.2d 392, 399 (Minn. 2001). "In cases where death resulted from self-defense, a defendant must have reasonably feared that he was threatened with great bodily harm or death and that the use of force to prevent that harm was reasonable." *Id.*

Appellant's argument that J.C. might have lunged at appellant just before the shot was fired is contrary to K.S.'s testimony. As already addressed, the only reasonable inference from K.S.'s testimony is that she saw appellant pull the trigger. And K.S. testified that she did not see J.C. make any movement toward appellant.

But even if J.C. lunged at appellant, K.S.'s testimony establishes that appellant was the initial aggressor in the confrontation. Appellant, who was angry and yelling loudly at J.C., came upstairs with a loaded shotgun, pumped it, and aimed it at J.C. "Although a defendant who is the first aggressor ordinarily is not entitled to claim self-defense, the right to self-defense will be revived if the defendant actually and in good faith withdraws from the conflict and communicates that withdrawal to the victim."

12

*Radke*, 821 N.W.2d at 324 n.3 (quotation omitted). But, there was no evidence that appellant withdrew from the conflict.

The second element of self-defense is subjective and depends on the defendant's state of mind. *State v Johnson*, 719 N.W.2d 619, 630-31 (Minn. 2006). A defendant's state of mind with respect to an actual and honest belief that he was in imminent danger of death or great bodily harm may be established circumstantially. *Id.* at 631. The third element is an objective test. *Id.* The court assesses whether the killing was necessary, "in light of the danger to be apprehended," to avert serious injury. *State v. Austin*, 332 N.W.2d 21, 24 (Minn. 1983).

Appellant argues that he subjectively and objectively believed that he was in imminent danger of death or great bodily harm based on the incident with the brick and on recent physical altercations between J.C. and others. But there was no evidence of any imminent danger at the time appellant went upstairs with the loaded gun. K.S. testified that she did not hear any yelling or raised voices when J.C. was downstairs talking to appellant and that J.C. brought the knife, which appellant had brought upstairs earlier, back downstairs. J.C. went upstairs to pack and, for the most part, ignored appellant's angry tirade. K.S.'s testimony indicates that when J.C. responded to one of appellant's angry questions, J.C. did so civilly. Also, appellant's claim that he was afraid of J.C. is undercut by his behavior on May 9 and the morning of May 10, when he went to J.C.'s parents' house to pick up J.C. and told F.D. that he was planning to have J.C. help him with a job.

The record evidence was sufficient to disprove beyond a reasonable doubt the first three elements of self-defense.

## C.

A person commits second-degree assault if he "assaults another with a dangerous weapon." Minn. Stat. § 609.222, subd. 1. Assault is defined as "an act done with intent to cause fear in another of immediate bodily harm or death." Minn. Stat. § 609.02, subd. 10 (2012). "'With intent to' . . . means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." *Id.* subd. 9(4) (2012).

> Intent may be proved by circumstantial evidence, including drawing inferences from the defendant's conduct, the character of the assault, and the events occurring before and after the crime. The intent of the actor, as contrasted with the effect upon the victim, becomes the focal point for inquiry. The crime is in the act done with intent to cause fear, not in whether the intended result is achieved.

*In re Welfare of T.N.Y.*, 632 N.W.2d 765, 769 (Minn. App. 2001) (quotations and citations omitted).

Citing *T.N.Y.*, appellant argues that "[a] person does not commit a second-degree assault any time he holds a firearm." In *T.N.Y.*, this court reversed a second-degree-assault conviction based on the following facts:

> T.N.Y. was a 13–year–old child facing three police officers protected by a large bunker and pointing their weapons at him. T.N.Y. did not point the gun directly at the officers nor did he make any threatening comments or motions that would indicate he intended to shoot the gun. T.N.Y. merely hesitated before dropping the gun and complying with the officers' directions.

14

632 N.W.2d at 770.

In other cases, the supreme court and this court have held that pointing a weapon at another person was sufficient to prove the requisite intent to cause fear. *State v. Cole*, 542 N.W.2d 43, 51 (Minn. 1996) (stating that a defendant's "intent to cause fear in [the victim] was carried out by his intentional pointing of a gun at her"); *State v. Kastner,* 429 N.W.2d 274, 276 (Minn. App. 1988) (defendant pointed scissors and screwdriver at victim, assumed a position that the victim considered threatening, and made threatening statements to victim), *review denied* (Minn. Nov. 16, 1988); *State v. Patton,* 414 N.W.2d 572, 574 (Minn. App. 1987) (defendant brandished knife in a manner that the jury could have found that it was used as a dangerous weapon to cause fear in another of immediate bodily harm); *State v. Soine,* 348 N.W.2d 824, 827 (Minn. App. 1984) (defendant brandished a knife "within striking distance" of his victim), *review denied* (Minn. Sept. 12, 1984)).

Appellant did not just hold a firearm. When he came upstairs to the bedroom, he poked K.S. in the back with a shotgun. When K.S. walked from side to side, appellant followed her movements with the shotgun's barrel. After K.S. went and stood next to J.C., appellant alternately pointed the shotgun at her and J.C. After fatally shooting J.C., appellant pointed the shotgun at K.S. and instructed her that she "better tell the police it was a f…ing accident." Appellant's acts were far more threatening than those committed by the *T.N.Y.* defendant. Under *Cole*, *Kastner*, *Patton*, and *Soine*, the evidence was

15

sufficient to prove that appellant intended to cause fear in K.S. of immediate bodily harm or death.

## II.

"Criminal defendants have a right to prepare and present a complete defense." *State v. Hokanson,* 821 N.W.2d 340, 350 (Minn. 2012). The right to present a defense includes "at a minimum, . . . the right to examine the witnesses against the defendant, to offer testimony, and to be represented by counsel. However, the defendant must still comply with established rules of evidence designed to assure both fairness and reliability in assessing guilt or innocence." *State v. Reese,* 692 N.W.2d 736, 740 (Minn. 2005) (citation omitted). An evidentiary ruling is reviewed for an abuse of discretion. *State v. Ashby*, 567 N.W.2d 21, 25 (Minn. 1997).

## A.

Appellant argues that the district court erred in limiting his cross-examination of Investigator McNamara and K.S. Minn. R. Evid. 611(b) limits the scope of cross-examination to the subject matter of the direct examination and to matters affecting the witness' credibility. *State v. Parker*, 585 N.W.2d 398, 406 (Minn. 1998). "[T]he [district] court possesses wide latitude to impose reasonable limits on cross-examination of a prosecution witness." *State v. Tran*, 712 N.W.2d 540, 550 (Minn. 2006).

*McNamara*

Appellant sought "to question [McNamara] and to offer some photographs regarding both the condition of the home on June 12th, and also the fact that [the computers] were gone at that point." There is no evidence that McNamara was involved

in the June 12 search, so she would not have been a proper witness to authenticate the photographs or testify about the condition of the home on that date. The district court did not abuse its discretion in limiting appellant's cross-examination of McNamara.

*K.S.*

"Subject to the [district] court's right to reasonably limit questioning, the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness by revealing to the jury the possible biases and ulterior motives of the witness being cross-examined." *State v. Pride,* 528 N.W.2d 862, 865 (Minn. 1995) (quotation omitted). "Whether the [district] court abused its discretion in restricting a defendant's attempted cross-examination that is aimed at showing bias turns on whether the jury has sufficient other information to make a discriminating appraisal of the witness's bias or motive to fabricate." *State v. Lanz–Terry,* 535 N.W.2d 635, 641 (Minn. 1995) (quotation omitted).

K.S. testified that she went to appellant's house on May 20 (ten days after the shooting) with some friends. The district court then sustained an objection to the question, "And you used a crowbar to break into the house, is that right?" Defense counsel did not ask any further questions about K.S. going to the house on May 20. There is no evidence in the record and no offer of proof that K.S. caused any damage to appellant's house or its contents other than allegedly using a crowbar to enter, and there is no evidence that she removed any items from the house. The fact that K.S. saw appellant fatally shoot J.C. in the presence of her children and the strained relations between appellant and K.S. and J.C. are stronger evidence of bias than allegedly using a

17

crowbar to enter the house where K.S. had previously resided. The district court did not abuse its discretion in limiting appellant's cross-examination of K.S.

**B.**

Appellant sought to introduce two photographs of J.C. holding a shotgun across his chest and smiling. Defense counsel argued that the photographs were relevant "to show both the fact that [J.C.] was familiar with firearms and to potentially go to the issue of the reasonableness of [appellant's] apprehension of danger as far as self-defense goes." On appeal, appellant argues that the photographs showed "J.C.'s violent disposition" and, therefore, were relevant to appellant's self-defense claim. But in the photographs J.C. is not holding the shotgun in a threatening manner, and the fact that J.C. held a shotgun across his chest at some point in time is not relevant to whether appellant reasonably feared imminent great bodily harm or death on the shooting date. The district court did not abuse its discretion in excluding the photographs.

**C.**

A crime victim's medical records generally are protected from disclosure by the physician-patient privilege. Minn. Stat. § 595.02, subd. 1(d), (g) (2012). But "the medical privilege, like other privileges, sometimes must give way to the defendant's right to confront his accusers." *State v. Kutchara,* 350 N.W.2d 924, 926 (Minn. 1984). "[T]he proper procedure is generally for the [district] court to review the medical records at issue in camera to determine whether the privilege must give way." *Reese,* 692 N.W.2d at 742. "The in camera approach strikes a fairer balance between the interest of the privilege holder in having his confidences kept and the interest of the criminal defendant in

18

obtaining all relevant evidence." *State v. Hummel,* 483 N.W.2d 68, 72 (Minn. 1992) (quotation omitted). Nonetheless, before granting a motion for an in camera review of privileged information, a defendant must make some "plausible showing" that the information sought is "material and favorable to his defense." *Id.* (quotation omitted). The decision whether to allow in camera review is within the district court's discretion. *See State v. Evans*, 756 N.W.2d 854, 872-73 (Minn. 2008) (applying abuse-of-discretion standard in reviewing district court's decision to limit its in camera review of witness's medical records to a single hospital visit that occurred on the day before the offense).

Appellant requested in camera review of J.C.'s mental-health treatment records from three facilities, arguing that the records might show a "propensity toward violent behavior or other mental health or behavioral issues." The district court found:

> Although [appellant] has a long history with the victim that appears to have greater depth than a normal tenant/landlord relationship, he only asserts the possibility of a propensity toward violence. In [appellant's] brief, he states the reason for seeking in camera review of [J.C.'s] mental health is because they may contain information related to a viable self-defense claim, [J.C.'s] state of mind, and [appellant's] ability to argue for a lesser crime. [Appellant] fails to demonstrate any specific showing of violent conduct by [J.C.]

The district court granted in camera review of J.C.'s juvenile delinquency and family court records, finding that "[appellant] has indicated having prior knowledge of [J.C.'s] juvenile court history so much so that the Court believes it is plausible the records will contain some evidence of violent behavior" and that "considering [appellant] had prior knowledge of the incidents that gave rise to the Juvenile Court proceedings, it is

plausible that any violent conduct contained within would have been known to [appellant] so as to impact his mental state at the time of the incident."

Because appellant made no specific showing connecting the treatment records to a propensity toward violence, did not provide information on the dates of or reasons for treatment, and did not establish a connection between the juvenile court records and the treatment records, we cannot conclude that the district court abused its discretion in denying in camera review of the treatment records. *See id.* at 873 (affirming denial of in camera review when the defendant "offered only argument and conjecture"); *Hummel*, 483 N.W.2d at 72 (affirming the denial of in camera review when the defendant provided "no theories on how the [confidential] file could be related to the defense or why the file was reasonably likely to contain information related to the case").

## III.

Appellant argues that the district court committed plain error in instructing the jury on self-defense. When there is no objection to a jury instruction, we review the instruction for plain error. *State v. Hayes,* 831 N.W.2d 546, 555 (Minn. 2013). "Under a plain error analysis, [a defendant] must show that (1) there was error; (2) the error was plain; and (3) his substantial rights were affected. An error is plain if it contravenes case law, a rule, or a standard of conduct." *Id.* (quotations and citations omitted).

A district court is allowed "considerable latitude in the selection of language for jury instructions." *State v. Ihle,* 640 N.W.2d 910, 916 (Minn. 2002). This court views jury instructions in their entirety to determine whether they fairly and adequately explain the law. *State v. Flores,* 418 N.W.2d 150, 155 (Minn. 1988). If the instructions, read as

a whole, correctly state the law "in language that can be understood by the jury, there is no reversible error." *State v. Peou,* 579 N.W.2d 471, 475 (Minn. 1998).

The district court instructed the jury on the first two elements of self-defense and then stated:

> . . . [F]inally, the amount and type of force used must not be excessive, but only such force as is necessary to prevent, resist, or defend against the assault. *In assessing whether the amount and type of force was excessive, you should consider the extent of the danger that was presented and whether there were alternative ways to avoid it, if [it] was reasonably possible to do so.* Generally, in defending against an assault, one has a duty to retreat to avoid the danger if it is reasonably possible to do so. But there is no duty to retreat from one's own home before defending oneself, even against a co-resident.
>
> Furthermore, if it was [appellant] who initiated the altercation by the use or threatened use of force, the right of self-defense is not immediately available to him. To regain his right of self-defense, he must do the following: discontinue the altercation, attempt in good faith to escape from it, and clearly show the other person that he wants to end the altercation. Only after taking these steps will the law allow him to resume the use of force in self-defense.

(Emphasis added.)

Appellant argues that the emphasized language misstated the law. In *Glowacki,* a case in which the defendant claimed self-defense for an offense that occurred in his home, the supreme court held that the district court erred in instructing the jury that the defendant "had a duty to 'avoid the danger if reasonably possible.'" 630 N.W.2d at 402. The court explained:

> While the court did not use the word "retreat" in the instruction, the thrust of the modified instruction could imply

21

that [the defendant] had a duty to leave his home if possible before resorting to the use of force in self-defense. The instruction given may not have been as damaging as if the word "retreat" had been used, but the instruction was still erroneous because [the defendant] was in his home and he is not required to leave his home before defending himself.

*Id.*

In this case, unlike in *Glowacki*, immediately after instructing the jury about the duty to avoid the danger if reasonably possible, the district court explained that "there is no duty to retreat from one's own home before defending oneself, even against a co-resident." "[T]he lack of a duty to retreat does not abrogate the obligation to act reasonably when using force in self-defense. Both the use of force and the level of force must be reasonable." *State v. Devens*, 852 N.W.2d 255, 258 n.5 (Minn. 2014) (citing *Glowacki*, 630 N.W.2d at 402). Read as a whole, the district court's instructions on the elements of self-defense correctly stated the law and did not constitute plain error.

**IV.**

Evidence of other bad acts, known as *Spreigl* evidence, is not admissible to prove that a defendant acted in conformity with his character. Minn. R. Evid. 404(b); *State v. Spreigl,* 272 Minn. 488, 490, 139 N.W.2d 167, 169 (1965). "The overarching concern behind excluding such evidence is that it might be used for an improper purpose, such as suggesting that the defendant has a propensity to commit the crime or that the defendant is a proper candidate for punishment for his or her past acts." *Fardan,* 773 N.W.2d at 315 (quotations omitted). But the evidence may be admissible for other purposes, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of

22

mistake or accident. Minn. R. Evid. 404(b). Two elements required for the admission of *Spreigl* evidence are that "the evidence must be relevant and material to the state's case" and that "the probative value of the evidence must not be outweighed by its potential prejudice to the defendant." *State v. Ness,* 707 N.W.2d 676, 686 (Minn. 2006).

The state moved to admit evidence of the assault that appellant committed on J.K., appellant's former roommate, as *Spreigl* evidence and under Minn. Stat. § 634.20 (2012). In a prosecution for charges involving domestic abuse, Minn. Stat. § 634.20 allows admission of "[e]vidence of similar conduct by the accused against . . . other family or household members" unless the district court finds the evidence more prejudicial than probative. *State v. McCurry*, 770 N.W.2d 553, 559 (Minn. App. 2009), *review denied* (Minn. Oct. 28, 2009). "Similar conduct" includes "domestic abuse," which includes acts of physical harm, bodily injury, or assault or the infliction of fear of imminent physical harm, bodily injury, or assault, against a family or household member. Minn. Stat. §§ 518B.01, subd. 2(a), 634.20 (2012).

The district court found:

> The *Spreigl* evidence is relevant and material to prove the two purposes stated [intent and absence of mistake or accident] as it involves [appellant] allegedly threatening the victims with violence and assaulting the victims after disputes relating to housing, and relevant to the issues in the case which are [appellant's] intent and whether the act was a mistake or accident.

Appellant argues that his self-defense claim took intent out of the case. But intent is an element of both offenses of which appellant was convicted. Appellant also argues that the assault against J.K. and the current offense are not sufficiently similar. Under

Minn. Stat. § 634.20, "evidence showing how a defendant treats his family or household members, such as his former spouses or other girlfriends sheds light on how the defendant interacts with those close to him, which in turn suggests how the defendant may interact with the victim." *State v. Valentine*, 787 N.W.2d 630, 637 (Minn. App. 2010), *review denied* (Minn. Nov. 16, 2010). "In determining the relevance and materiality of *Spreigl* evidence, the [district] court should consider the issues in the case, the reasons and need for the evidence, and whether there is a sufficiently close relationship between the charged offense and the *Spreigl* offense in time, place, or modus operandi." *State v. Lynch*, 590 N.W.2d 75, 80 (Minn. 1999) (quotation omitted). The general rule is that "*Spreigl* evidence need not be identical in every way to the charged crime, but must instead be sufficiently or substantially similar to the charged offense." *Ness*, 707 N.W.2d at 688 (quotation omitted).

Appellant argues that the assault against J.K. had little to no probative value and was unduly prejudicial. But the assault against J.K. tended to prove that appellant intentionally committed a violent act against a household member when a problem occurred in the relationship and was not so similar to the current offense as to be unduly prejudicial.

Even if the district court erred in admitting the *Spreigl* evidence, appellant is not entitled to reversal of his conviction unless there is a reasonable possibility that the evidence significantly affected the verdict. *State v. Riddley*, 776 N.W.2d 419, 427 (Minn. 2009). When determining whether evidence significantly affected the verdict, the court considers facts including whether other evidence was presented on the issue for which the

24

other bad acts evidence was offered; whether the district court gave a cautionary instruction; the extent to which the state relied on the evidence in closing; and the strength of the evidence against the defendant. *Id.* at 428. The *Spreigl* evidence was presented through the testimony of a single witness, the district court gave cautionary instructions before the evidence was presented and in final instructions, and the state did not address it during closing argument. Considering these factors and the strength of the evidence against appellant, there is no reasonable possibility that the *Spreigl* evidence significantly affected the verdict.

When multiple trial errors occur, their cumulative effect must be addressed. *State v. Duncan*, 608 N.W.2d 551, 558 (Minn. App. 2000) (reversing convictions when cumulative effect of individually harmless errors deprived defendants of a fair trial), *review denied* (Minn. May 16, 2000). The only other possible trial error was the prosecutor's argument about the shotgun not being recovered. If erroneous, both the prosecutor's argument and the admission of the *Spreigl* evidence were minor errors, the cumulative effect of which did not deprive appellant of his right to a fair trial.

**Affirmed.**